08/23/2022 3:37 PM FAX 9099858936     BANFIED UPLAND                  ☑ 0028/0037

Electronically FILED by Superior Court of California, County of Los Angeles on 08/16/2022 08:59 AM Sherri R. Carter, Executive Officer/Clerk of Court, by S. Ruiz, Deputy Clerk
22STCV26414
Assigned for all purposes to: Stanley Mosk Courthouse, Judicial Officer: Stephen Goorvitch

Oscar Ramirez (State Bar No. 236768)
Matthew P. Blair (State Bar No. 278411)
Kirill Lavinski (State Bar No. 326939)
**BLAIR & RAMIREZ LLP**
515 South Flower Street, 19th Floor
Los Angeles, CA 90071
Tel: (213) 568-4000 • Fax: (213) 568-4100
eservice@blairramirez.com

Attorneys for Plaintiff NINA PUSATERI

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF LOS ANGELES

| | |
|---|---|
| NINA PUSATERI, an individual,<br><br>　　　　　　Plaintiff,<br><br>vs.<br><br>MEDICAL MANAGEMENT INTERNATIONAL, INC. d/b/a Banfield Pet Hospital; TANEEKA BAUTISTA, an individual; LISETTE FARVE, an individual; and DOES 1 through 20, inclusive,<br><br>　　　　　　Defendants. | Case No.: 22STCV26414<br><br>**COMPLAINT FOR DAMAGES**<br><br>(1) **Whistleblower Retaliation;**<br>(2) **Intentional Infliction of Emotional Distress**<br><br>**DEMAND FOR JURY TRIAL**<br>**UNLIMITED CIVIL CASE** |

Plaintiff NINA PUSATERI hereby brings this Complaint against MEDICAL MANAGEMENT INTERNATIONAL, INC. d/b/a Banfield Pet Hospital, TANEEKA BAUTISTA, LISETTE FARVE, and DOES 1 through 20, inclusive, and on information and belief alleges as follows:

### JURISDICTION AND VENUE

1. Plaintiff hereby brings this complaint for compensatory, special, general, and punitive damages for whistleblower retaliation and intentional infliction of emotional distress. This Court has jurisdiction over Defendants' violations because their actions against Plaintiff occurred

1. in the State of California and the amount in controversy exceeds this court's jurisdictional minimum.

2. Venue is proper under Code of Civil Procedure §§ 395(a) and 395.5 because one or more Defendants resides in Los Angeles County.

## PARTIES

3. Plaintiff, NINA PUSATERI ("Dr. Pusateri" or "Plaintiff"), is an individual over the age of eighteen (18). At all relevant times, Dr. Pusateri has been a resident of the State of California and the County of Los Angeles.

4. Defendant MEDICAL MANAGEMENT INTERNATIONAL, INC. d/b/a Banfield Pet Hospital ("Banfield") is a foreign corporation operating veterinary facilities in many locations in multiple states, including California.

5. Defendant LISETTE FARVE (Dr. Farve) is an individual over the age of eighteen (18). At all relevant times, Dr. Farve was the chief of staff at the Banfield hospital where Dr. Pusateri was employed. Dr. Farve is a resident of Los Angeles County.

6. Defendant TANEEKA BAUTISTA (Dr. Bautista) is an individual over the age of eighteen (18). At all relevant times, Dr. Bautista was the doctor of veterinary quality for the region and Dr. Farve's superior. Dr. Bautista is a resident of Los Angeles County.

7. The true names and capacities Defendants DOES 1 through 20, inclusive, are unknown to Plaintiff, who therefore sues said Defendants by such fictitious names. Plaintiff will amend this Complaint to allege their true names and capacities when ascertained. Plaintiff is informed and believes and thereon alleges that each of the Defendants named herein as DOES 1 through 20, inclusive is intentionally or negligently responsible, or is otherwise liable, in some manner, either vicariously or by virtue of his, her, or its own conduct, negligence or failure to act, or for the conduct, negligence or failure to act on the part of his, her, or its agents, servants or employees, for the acts and occurrences herein referred to, and has proximately caused injury and damages thereby to Plaintiff as result of their conduct hereinafter described.

///
///

2
COMPLAINT FOR DAMAGES

## FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

8. Dr. Pusateri worked at the District as a Doctor of Veterinary Medicine from approximately June 2018 until her termination in April 2022.

9. Dr. Pusateri excelled at enjoyed her work at Banfield, both in taking care of her nonhuman patients and dealing with their human owners.

10. Dr. Pusateri's productive career with Banfield was suddenly sent off-track when on January 28, 2022, she discovered that medications had been illegally prescribed and dispensed to patients under her name without her knowledge or consent.

11. On that day, Dr. Pusateri received a note from one of Banfield's receptionists that a client wanted refills of Galliprant, a non-steroidal anti-inflammatory drug, for their pet dog. Dr. Pusateri checked the patient's file to see if the refill was warranted, as well as soliciting the opinion of her chief of staff, Dr. Lisette Farve. Because the canine in question was very senior and had not been seen in over a year for bloodwork to check liver function (a critical consideration when prescribing certain drugs), Dr. Pusateri went into the records system to decline the prescription until the pet was brought in for a visit and testing. This was in line with her usual practice to note in a patient's records whether she approved or declined a prescription request, as well as any other pertinent details.

12. Upon examining the patient's records, Dr. Pusateri saw that the medication in question had been ordered under her name back in July 2021 with 5 refills and already sold to the client with five refills—all without her knowledge or permission. All five refills (one per month) had been used at this point in late January 2022, which is why the matter had come to Dr. Pusateri's attention.

13. Dr. Pusateri immediately informed Dr. Farve of her discovery and that the name of the hospital's long-time practice manager, Teresa Montoya, was on the records as having dispensed the prescription.

14. Banfield uses a records management system called Petware. The Petware system has an insecure dropdown menu that allows any staff member to select a doctor's name and put in

notes or prescribe medications under that doctor's name—without any form of authentication or any other mechanism to ensure that the doctor in question has approved the transaction.

15. In this case, Ms. Montoya selected Dr. Pusateri's name in the dropdown menu and improperly used it to issue the Galliprant prescription, along with refills, in July 2021 without Dr. Pusateri's knowledge or consent. Ms. Montoya then used her own system password to actually sell and dispense the drugs to the client.

16. When Dr. Pusateri confronted Ms. Montoya, Ms. Montoya was evasive and claimed not to know what had happened. She speculated that the incident must have been the result of a software glitch.

17. After the first incident, Dr. Pusateri quickly found additional instances of medications being prescribed under her name, as well as another doctor's name, without any notes of approval. In some cases, medications were prescribed under the name of a doctor who did not even have a veterinarian-client-patient relationship with the client and patient in question. For example, Dr. Pusateri found an instance of Posatex, an ear medication, that had been prescribed under her name without her approval. The prescription did not even have the proper instructions or list potential side effects—information that was required to be routinely included when dispensing any prescription. Once again, the prescriptions in question were improperly dispensed by the practice manager, Ms. Montoya.

18. Having discovered at least four such incidents of prescription medication being dispensed without her knowledge or consent, Dr. Pusateri was extremely concerned because of the legal and ethical implications of such acts. Not only is it unethical and illegal to prescribe medications without a doctor-patient-client relationship, but an improperly dispensed prescription that causes harm to the patient could even result in professional disciplinary action against Dr. Pusateri's license or a lawsuit on the part of the client.

19. Dr. Pusateri promptly informed Dr. Farve of the new discoveries. Dr. Tankeeka Bautista, the doctor of veterinary quality for the region and Dr. Farve's superior, along with Sindia Tuttle, an HR representative, were also copied on the correspondence. Dr. Farve did not treat the situation with the seriousness it deserved, instructing Dr. Pusateri to simply discuss these blatantly

1  unethical and illegal acts with Ms. Montoya and offering to discuss them in an informal "team
2  huddle" that would make the situation public and expose Dr. Pusateri to retaliation.
3      20.    Ms. Montoya, as a very long-tenured employee, enjoyed close relationships with
4  hospital management and was seen as untouchable regardless of her misconduct. Ms. Montoya had
5  retaliated for perceived slights in the past by overbooking the "offending" doctor, making it
6  difficult for them to take a lunch, and was generally demeaning and passive-aggressive toward
7  other staff. Dr. Pusateri was therefore justifiably concerned about retaliation if the very serious
8  evidence of misconduct on Ms. Montoya's part was not handled appropriately and at a high-enough
9  level.
10     21.    On February 28, 2022, Ms. Tuttle informed Dr. Pusateri via email that the
11 investigation had been completed and that Dr. Farve would discuss the findings with Dr. Pusateri.
12 Dr. Pusateri made clear that given the legal implications of the situation, including the risk to her
13 professional license and the potential for malpractice lawsuits on the part of clients, she would only
14 discuss the findings in writing so that everything could be properly documented. Dr. Pusateri was
15 especially wary because of prior situations at Banfield where one-on-one in-person or telephonic
16 meetings were used to make problematic statements and make excuses "off the record."
17     22.    Bizarrely, despite multiple followups, Banfield and its management refused to
18 discuss the findings of their purported investigation in writing or the actions to taken to make sure
19 that the situation would not be repeated. Instead, they insisted repeatedly on an in-person or
20 telephonic one-on-one meeting with Dr. Pusateri, in which they could make statements and excuses
21 for Ms. Montoya "off the record" and thus attempt to sweep the whole issue under the rug. Dr.
22 Pusateri, on her part, repeatedly reiterated her concerns about the seriousness of the situation and
23 its legal and ethical implications, which warranted the findings of the investigation being put in
24 writing.
25     23.    The stress that the conflict with both Ms. Montoya and her supervisors had caused
26 Dr. Pusateri was such that she became physically ill. On April 1, 2022, Dr. Pusateri was not feeling
27 well and felt like she would vomit on the way to work, but showed up to work anyway. Upon
28 arriving, she noticed several abnormalities. First, Ms. Montoya stayed in the back of the hospital,

where patient care takes place, contrary to her usual practice of spending most of her work time in the front where she meets with customers and has meetings with managers. In addition, Dr. Pusateri's schedule was blank with no explanation after 3 p.m., when she usually has in-room appointments.

24. Because she was feeling ill, and in line with the usual practice at Banfield of a doctor being free to leave after seeing all of her patients for that day, Dr. Pusateri left the hospital at 3 p.m.

25. Dr. Pusateri then found out from a front desk staff member that Dr. Farve and Dr. Bautista were planning to show up at the hospital that day at 5 p.m. without warning. Whereas normally, meetings between Dr. Pusateri and any of her supervisors would be scheduled ahead of time and calendared accordingly, this time it was evident that their intention was to ambush Dr. Pusateri.

26. At 4:12 p.m. on April 1, 2022, Dr. Pusateri sent Dr. Farve and Dr. Bautista an email confronting Dr. Farve and Dr. Bautista about their attempts to bully and intimidate her into an off-the-record meeting so that the results of the investigation and Dr. Pusateri's allegations could be swept under the rug. In response, Dr. Bautista wrote that Dr. Pusateri had "left without approval" and instructed her not to return to the hospital until further notice. Dr. Pusateri's Banfield email address was deactivated the same day.

27. Banfield management then proceeded to lie to hospital staff concerning Dr. Pusateri's absence, saying that she was "sick with no known return time," while keeping Dr. Pusateri in the dark.

28. Finally, on April 13, 2022 Dr. Bautista sent a letter to Dr. Pusateri terminating her for "violation of our Conduct and Ethics"—an ironic twist, given that Dr. Bautista and Dr. Farve steadfastly refused to properly address Dr. Pusateri's ethical and legal concerns.

29. But for the actions and or omissions of Dr. Farve, Dr. Bautista, Ms. Montoya, and other Banfield managers, Dr. Pusateri would still be employed at Banfield without damage to her reputation, damage to her ability to earn a living, and the devastating psychological impact the bullying, intimidation, and ultimate termination.

///

## FIRST CAUSE OF ACTION

### WHISTLEBLOWER RETALIATION (CAL. LAB. CODE § 1102.5)

### (Against All Defendants)

30. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

31. Cal. Lab. Code § 1102.5 prohibits an employer, or any person acting on behalf of the employer, from discriminating, retaliating, or otherwise taking any adverse action against any employee who engages in protected activity.

32. Plaintiff's protected activity includes, but is not limited to, expressing concerns to her managers (including Dr. Farve and Dr. Bautista) concerning the illegal and unethical acts of Ms. Montoya in prescribing and dispensing medication under Plaintiff's name (as well as that of another doctor) without her knowledge, permission, or consent. Such conduct by Ms. Montoya was in violation of the California Code of Regulations, Title 16, Section 2032.1, which provides, among other things, that "[a] drug shall not be prescribed for a duration inconsistent with the medical condition of the animal(s) or the type of drug prescribed" and that "[n]o person may practice veterinary medicine in this state except within the context of a veterinarian-client-patient relationship or as otherwise permitted by law;" and further, that "[the veterinarian-client-patient relationship] must be established for each medical condition for which the animal is being treated by the veterinarian."

33. As described above, Defendants retaliated against Plaintiff by attempting to sweep Plaintiff's complaints and the results of their purported investigation under the rug, refusing to divulge or discuss the results of the investigation in writing, attempting to intimidate and bully her into an off-the-record in-person or telephonic meeting where problematic statements or excuses could be made without leaving evidence, and ultimately by terminating her.

34. Plaintiff is informed and believes and based thereon alleges that his protected activity was the direct and proximate cause in Defendants' decision to terminate Plaintiff's employment in violation of Lab. Code § 1102.5.

///

35. Defendants' unlawful conduct as alleged above was a substantial factor in causing damage to Plaintiff.

36. As a direct and proximate result of Defendants' acts and failures to act, as alleged herein, Plaintiff has suffered and continues to suffer economic loss and damages, noneconomic damages occasioned by the loss of her job and the smearing of her reputation, and attorneys' fees and costs in an amount to be proven at trial.

37. The conduct of the Defendants, and their agents and employees as described herein, was malicious and/or oppressive, and done with a willful and conscious disregard for Plaintiff's rights, and for the deleterious consequences to Plaintiff of Defendants' actions. Defendants, and their agents and employees, authorized, condoned, and ratified the unlawful conduct of each other. Consequently, Plaintiff is entitled to punitive damages against Defendants.

## SECOND CAUSE OF ACTION
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Against All Defendants)

38. Plaintiff re-alleges and incorporates by reference all previous paragraphs as though fully set forth herein.

39. The conduct of Defendants as set forth above was so extreme and outrageous that it exceeded the boundaries of human decency. This conduct was intended to cause severe emotional distress or was done in reckless disregard of the probability of causing severe emotional distress.

40. Defendants' conduct in bullying, intimidating, and harassing Plaintiff in retaliation for her reporting of Ms. Montoya's illegal and unethical conduct is beyond conduct which may be considered an ordinary part of an employment relationship.

41. As an actual and proximate result of Defendants' wrongful conduct, Plaintiff has suffered and continues to suffer severe and continuous humiliation, emotional distress, and physical and mental pain and anguish, all to his damage in an amount according to proof at the time of trial.

42. The conduct of the Defendants, and its agents and employees as described herein, was malicious and/or oppressive, and done with a willful and conscious disregard for Plaintiff's

8
COMPLAINT FOR DAMAGES

rights, and for the deleterious consequences to Plaintiff of Defendants' actions. Defendants, and their agents and employees, authorized, condoned, and ratified the unlawful conduct of each other. Consequently, Plaintiff is entitled to punitive damages against Defendants.

### PRAYER

WHEREFORE, Plaintiff prays for judgment for himself against Defendants, as follows:

1. Upon the First Cause of Action, for compensatory, consequential, general, and special damages according to proof in an amount no less than $10 million, including attorney's fees and costs pursuant to Cal. Lab. Code § 1102.5;

2. Upon the Second Cause of Action, for compensatory, consequential, general, and special damages in an amount no less than $10 million, according to proof;

3. On all causes of action, for punitive damages against all Defendants that will be sufficient to punish and deter Defendants from continuing their retaliatory, abusive, and malicious behavior;

4. For prejudgment interest;

5. For costs of suit herein incurred;

6. For such other and further relief, the Court may deem just and proper.

Respectfully submitted,

Dated: August 15, 2022                BLAIR & RAMIREZ LLP


By: _____K. Lavinski_____
Kirill Lavinski
Attorneys for Plaintiff
NINA PUSATERI

9
COMPLAINT FOR DAMAGES

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial with respect to all issues triable by jury.

Dated: August 15, 2022          BLAIR & RAMIREZ LLP

By: *K. Lavinski*
Kirill Lavinski
Attorneys for Plaintiff
NINA PUSATERI

10
COMPLAINT FOR DAMAGES